CASE NO. 23-1572

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

Center for Biological Diversity
*Plaintiff – Appellee*

v.

Sarah Strommen, in her official capacity as Commissioner of the Minnesota
Department of Natural Resources
*Defendant - Appellee*

v.

Minnesota Trappers Association; National Trappers Association; Fur Takers
of America, Inc.
*Intervenor Defendants – Appellants*

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
CASE NO. 20-CV-02554 (ECT/JFD)

**PRINCIPAL BRIEF OF APPELLANTS**

**GARY R. LEISTICO (#024448X)**
**JAYNE E. ESCH (#0399215)**
Leistico & Esch, PLLC
P.O. Box 365
Clear Lake, MN 55319
Telephone: (763) 272-5825
Fax: (763) 392-0757
Email: gleistico@leisticoesch.com
Email: jesch@leisticoesch.com
*Attorneys for Intervenor Defendants - Appellants Minnesota Trappers*
*Association; National Trappers Association; Fur Takers of America, Inc.*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

This case is a continuation of previous litigation in which Plaintiff/Appellee Center for Biological Diversity (CBD) sued the Minnesota Department of Natural Resources (DNR) alleging that the state's trapping and snaring laws allowed incidental bycatch of Canada lynx in violation of the Endangered Species Act (ESA) – *Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073 (D.Minn.2008). In this case, CBD generally claims the consent decree and additional trapping and snaring restrictions the DNR implemented in the previous *Holsten* case are insufficient and still result in the take of lynx in violation of the ESA. CBD and the DNR made a motion for the District Court to approve a new consent decree in this case, which requires the DNR to implement additional restrictions on trapping and snaring. Appellants/Intervenors Minnesota Trappers Association, National Trappers Association and Fur Takers of America (the Trappers) objected to the consent decree, but the District Court approved it. The Trappers respectfully believe the District Court abused its discretion in approving the consent decree because the consent decree is procedurally unfair, and the new restrictions are unreasonable considering no incidental bycatch of lynx since the 2008 litigation has been detrimental to the persistence of the species, nor are the new restrictions specifically tailored to address any past harm. The Trappers respectfully request that the Court permit oral argument and that each side be given 15 minutes to present.

ii

## CORPORATE DISCLOSURE STATEMENT

Appellants Minnesota Trappers Association, National Trappers Association, and Fur Takers of America, Inc. do not have a parent corporation, and no publicly held corporation owns 10 percent or more of their stock. *See* Fed. R. App. P. 26.1(a); Eighth Circuit Rule 26.1A.

Appellate Case: 23-1572     Page: 3     Date Filed: 06/16/2023 Entry ID: 5287735

# TABLE OF CONTENTS

**PAGE**

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ....... ii

CORPORATE DISCLOSURE STATEMENT ..................................................... iii

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES ................................................................................. vi

JURISDICTIONAL STATEMENT ..................................................................... 1

STATEMENT OF THE ISSUE ............................................................................ 1

STATEMENT OF THE CASE ............................................................................. 1

SUMMARY OF THE ARGUMENT ................................................................... 6

ARGUMENT .......................................................................................................... 7

I.   The District Court Abused its Discretion in Approving the Consent Decree. ................................................................................................... 7

    A.   Consent decrees are reviewed for procedural and substantive fairness, reasonableness, and consistency with the governing law. ........................................................................ 7

    B.   The District Court's adoption of the consent decree was procedurally unfair. ................................................................ 9

    C.   The rulemaking process in the consent decree is unfair. ................. 12

    D.   The consent decree's additional trapping restrictions are unreasonable, unduly burdensome, and ineffective at preventing the already minimal bycatch of lynx. ................................................. 14

        i.   The loop stop requirement in paragraph 6(a)(i) is unreasonable and unsupported in the record ......................... 21

        ii.   The lock requirement in paragraph 6(a)(ii) is unreasonable and unsupported in the record ......................... 23

Appellate Case: 23-1572     Page: 4     Date Filed: 06/16/2023 Entry ID: 5287735

iii.    The anchoring restriction in paragraph 6(b) is
        unreasonable and unsupported in the record..........................24

CONCLUSION .................................................................................26

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ...................................27

CERTIFICATE OF SERVICE ..........................................................28

v

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE**

*Am. Bald Eagle v. Bhatti*, 9 F.3d 163 (1st Cir. 1993)..........................................15

*Animal Prot. Inst., Ctr. for Biological Diversity v. Holsten*, 541 F. Supp. 2d 1073 (D. Minn. 2008) .......................................................................................1, 2, 15

*Animal Prot. Inst. v. Holsten*, Civ. No. 06-3776 (MJD/RLE) 2008 WL 5481122... .................................................................................................................2, 10

*Animal Prot. Inst. v. Merriam*, 242 F.R.D. 524 (D. Minn. 2006)..........................2

*Center for Biological Diversity v. Otter*, 2018 WL 539329 (D. Idaho Jan. 24, 2018) ...................................................................................................................17

*E.E.O.C. v. Prod. Fabricators, Inc.,* 666 F.3d 1170 (8th Cir. 2012)....................... ................................................................................ 1, 6, 7, 8, 9, 10, 11

*Kern v. TXO Prod. Corp.*, 738 F.2d 968 (8th Cir. 1984)......................................8

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371 (8th Cir. 1990) ...................................................................................................9

*Local No. 93,* 478 U.S. at 524 n. 13, 106 S.Ct. 3063...........................................11

*Ramsey v. Kantor*, 96 F.3d at 434 (9th Cir. 1996)..............................................17

*Schaub v. VonWald*, 638 F.3d 905 (8th Cir. 2011)................................................7

*SEC v. Randolph,* 736 F.2d 525 (9th Cir.1984)....................................................11

*Smith v. AS Am., Inc.*, 829 F.3d 616 (8th Cir. 2016) ..............................................7

*United States v. BP Amoco Oil PLC*, 277 F.3d 1012 (8th Cir. 2002) ...........7, 8, 9

*United States v. Hercules, Inc.*, 961 F.2d 796 (8th Cir. 1992) ..............................8

*United States v. Hilger*, No. 16-CV-0060 (WMW/TNL), 2017 WL 4773329 (D. Minn. June 7, 2017) ...........................................................................................8

*United States v. Metropolitan St. Louis Sewer Dist.*, 952 F.2d 1040 (8th Cir. 1992) .................................................................................................................8

Appellate Case: 23-1572    Page: 6    Date Filed: 06/16/2023 Entry ID: 5287735

*United States v. Union Elec. Co.*, 132 F.3d 422 (8th Cir. 1997) ...........................9

*WildEarth Guardians v. United States Fish & Wildlife Serv.*, 342 F. Supp. 3d 1047 (D. Mont. 2018) ...............................................................................................17

## STATUTES

16 U.S.C.A. § 1538(a)(1)(B) .....................................................................15

16 U.S.C. 1531 .........................................................................................15

16 U.S.C. § 1538 .........................................................................................2

16 U.S.C. 1540(g) ...........................................................................1, 3, 12

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. 1331 .............................................................................................1

Minn. Stat. 14.14 to 14.28.................................................................12, 13

Minn. Stat. 14.388 ....................................................................................13

Minn. Stat. 84.027 subd. 13(b) ...............................................6, 13, 14

Minn. Stat. 97A.0451 ...............................................................................14

Minn. Stat. 97A.0451 to 97A.0459................................................13, 14

Minn. Stat. 97A.0452 ...............................................................................14

Minn. Stat. 97A.0454...............................................................................14

## REGULATIONS

50 C.F.R. § 17.31(a)..................................................................................15

50 C.F.R. 17.40(k) ....................................................................................15

50 C.F.R. 17.95(a)....................................................................................15

## RULES

Fed. R. Civ. App. P. 4(a)(1)(A) ................................................................1

Appellate Case: 23-1572     Page: 7     Date Filed: 06/16/2023 Entry ID: 5287735

Fed. R. Civ. P. 52(a)) ....................................................................7

Minn. R. 6234.0900, subp. 6 ......................................................5

Minn. R. 6234.1000 .....................................................................3

Minn. R. 6234.1000, subp. 5 ......................................................2

Minn. R. 6234.2200 .....................................................................3

Minn. R. 6234.2400 .....................................................................3

Minn. R. 6234.2700 .....................................................................3

## **OTHER**

46 FR 54748-01 ..........................................................................16

65 FR 16053 (March 24, 2000).................................................15

79 Fed. Reg. 54782, 54823-25, 54843 (Sept. 12, 2014).........3

Appellate Case: 23-1572    Page: 8    Date Filed: 06/16/2023 Entry ID: 5287735

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to federal question jurisdiction, 28 U.S.C. 1331, relating to the citizens suit provision of the Endangered Species Act, 16 U.S.C. 1540(g).

This Court has jurisdiction over the appeal under 28 U.S.C. § 1291. This is an appeal pursuant to Fed. R. Civ. App. P. 4(a)(1)(A) from a final judgment and order. The District Court entered its final order and judgment on February 22, 2023. App. at 204-239; R. Doc. 118, 119, and 120; *see also* Addendum. Appellants filed a timely notice of appeal on March 22, 2023. App. at 240-41; R. Doc. 121.

# STATEMENT OF THE ISSUE

1) Whether the district court abused its discretion in approving the consent decree by not considering a relevant factor that should have been given significant weight, by considering an irrelevant or improper factor and/or by committing a clear error of judgment when weighing relevant factors.

Apposite Authority:

*E.E.O.C. v. Prod. Fabricators, Inc.*, 666 F.3d 1170 (8th Cir. 2012)

# STATEMENT OF THE CASE

This litigation was commenced in December 2020. Compl., App. 77-93; R. Doc. 1. This case is a continuation of a previous case, *Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073 (D. Minn. 2008). In this previous case, Plaintiff/Appellee

1

Center for Biological Diversity (CBD) sued the Minnesota Department of Natural Resources (DNR), alleging it "violat[ed] Section 9 of the Endangered Species Act, 16 U.S.C. § 1538, by authorizing and allowing trapping and snaring activities that 'take' Canada lynx." *Id.* at 1075. Appellant Trappers intervened on behalf of the DNR in this case. *Id.* at 1077; *see also Animal Prot. Inst. v. Merriam*, 242 F.R.D. 524, 526 (D. Minn. 2006) (granting motion to intervene).

On cross-motions for summary judgment, the court in *Holsten*, Honorable Judge Michael J. Davis, concluded the DNR was liable for violating the ESA. *Holsten*, 541 F. Supp. 2d at 1081. The court ordered the DNR to: (1) apply for an incidental take permit (ITP) from the U.S. Fish & Wildlife Service; and (2) come up with a proposal to modify, eliminate, or reduce the incidental take of lynx. *Id.*

The DNR complied with the court's order by applying for an ITP and proposing several regulatory changes that were designed to reduce the risk that lynx would be caught in traps set for other species. *See Holsten*, Civ. No. 06-3776 (MJD/RLE), 2008 WL 5481122. Judge Davis approved the DNR's proposal and ordered the DNR to implement the proposed regulatory changes. *Id.*

The DNR adopted two primary regulatory changes. First, the DNR established a Lynx Management Zone, which lies north and east of Highway 53 in northeastern Minnesota. *See* Minn. R. 6234.1000, subp. 5. The Lynx Management Zone aligns with the area that U.S Fish & Wildlife Service designated as "critical habitat" for

lynx in Minnesota. *See Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of Canada Lynx*, 79 Fed. Reg. 54782, 54823-25, 54843 (Sept. 12, 2014). Second, the DNR adopted additional trapping restrictions that apply within the Lynx Management Zone. *See* Minn. R. 6234.1000, 6234.2200, 6234.2400, 6234.2700; *see also* App. at 57-58 (Ex. D-3 at 54-55); App. at 4, 7 (Tr. at 21, 33). The restrictions covered snares, foothold traps, and body-gripping traps. *Id*. The regulatory changes from 2008, including the special trapping restrictions that apply in the Lynx Management Zone, remain in effect today. *See* App. at 59-65 (Ex. D-31).

Judge Davis ordered that "[u]pon implementation of the regulatory and programmatic changes as set forth in the State's Proposal, the State will be in compliance with Section 9 of the ESA." 2008 WL 5481122, at *2. Furthermore, Judge Davis said: "This Court shall retain jurisdiction of this case under 16 U.S.C. § 1540(g) in order to modify or terminate the order for good cause shown, or to resolve any disputes arising thereunder." *Id*.

In the present case, CBD sued the DNR again, alleging that the agency remained in violation of the ESA because lynx continued to be caught in traps set for other species. Compl., App. at 77-93; R. Doc. 1. The Complaint alleges that fifteen lynx were caught in traps set for other species since 2008; the DNR's 2008

Appellate Case: 23-1572    Page: 11    Date Filed: 06/16/2023 Entry ID: 5287735

regulatory changes are insufficient, and the DNR remains in violation of the ESA. *See generally id.*

The DNR moved to dismiss, arguing that CBD lacked standing; the claim was barred by the doctrine of claim preclusion, and that the Center had failed to allege a plausible violation of the ESA on the merits. *See* App. at 94-118, R. Doc. 13 and 15, Mot. to Dismiss and Mem. in Supp. of Mot. to Dismiss. The District Court, however, denied the DNR's motion to dismiss. App. at 119-136; R. Doc. 26, Opinion and Order on Mot. to Dismiss.

The Trappers moved to intervene in the case in February 2022. App. at 137-153; R. Doc. 41 and 43, Mot. to Intervene and Mem. in Supp. of Mot. to Intervene. The Trappers' motion to intervene was not opposed by the parties, and intervention was granted by the court in March 2022. App. at 154-55; R. Doc. 57, Order Granting Mot. to Intervene.

In June 2022, CBD and the DNR filed a motion to approve a consent decree to resolve the litigation. App. at 156-160; R. Doc. 71. The consent decree proposes to adopt five additional trapping rules that would apply in the Lynx Management Zone, as follows:

 a. In the Lynx Management Zone, snares, except when placed as water sets, must be equipped with: (i) a minimum loop stop that prevents the snare loop from closing to a diameter less than 3 ¼ inches; and (ii) a one-piece snare lock that contains no moving parts, has no integrated or attached compression springs, and has a side that contacts the animal that is a minimum of ½ inch in width.

4

b. In the Lynx Management Zone, snares, except when placed as water sets, may not be attached or anchored to a fence or tree, and may not be set in a location such that they, when fully extended, can reach any part of a fence, or any rooted vegetation greater than ½ inch in diameter.

c. In the Lynx Management Zone, snares, except when (i) placed as water sets or (ii) used by a licensed wolf trapper as a "wolf snare" within the meaning of Minn. R. 6234.0900, subp. 6, may not exceed 7 feet in length from the anchor point to the end of the snare when fully extended.

d. In the Lynx Management Zone, snares, except when placed as water sets, must be equipped with at least 1 swivel.

e. In the Lynx Management Zone, a person may not set, place, or operate any foothold trap that has a maximum jaw opening, when set, of greater than 6 ½ inches measured from the inside edges of the jaw, except when (i) placed as a water set or (ii) used by licensed wolf trappers during a wolf season.

App. at 163-64; R. Doc. 72 at 3 § V ¶ 6(a)-(e).

The Trappers objected to CBD's and the DNR's motion for entry of the proposed consent decree. App. at 171-77; R. Doc. 76. The District Court ordered an evidentiary hearing to consider the consent decree. App. at 178-79; R. Doc. 83. At the evidentiary hearing, the court received a number of exhibits into evidence and heard testimony from two witnesses. The DNR presented the testimony of Dr. John D. Erb in support of the decree. App. at 1-43; Tr. at 9-178. The Trappers presented the testimony of Bert Highland, Vice President of the Minnesota Trappers Association, in opposition to the decree. App. at 44-56; Tr. at 181-232. CBD did not present testimony from any witness but participated in the hearing. App. at 16, 40, 43, 54; Tr. at 70, 165, 177, 223.

5

Following post-hearing briefing by the parties, the District Court issued an order adopting the consent decree. App. at 204-239; R. Doc. 118, 119, and 120; *see* Addendum. This appeal follows.

## SUMMARY OF THE ARGUMENT

The District Court abused its discretion in approving the consent decree. The District Court's adoption of the consent decree is procedurally unfair as the Trappers did not have an opportunity to object on standing, *res judicata*, or merits determinations. The Eighth Circuit held in *E.E.O.C. v. Prod. Fabricators, Inc.*, 666 F.3d 1170 (8th Cir. 2012) that continuing jurisdiction is the norm for consent decrees, and, here, Judge Davis specifically stated in the 2008 litigation that he retained continuing jurisdiction over the consent decree and any disputes that should arise thereunder. The substance of the consent decree is additionally unfair because the DNR intends to adopt the new rules through expedited emergency rulemaking under Minn. Stat. 84.027, subd. 13(b), which does not allow for any public comment or participation in the rulemaking process.

The District Court further abused its discretion in approving the consent decree by failing to consider the overall goal of the Endangered Species Act (ESA) and the specific bycatch of lynx since the 2008 litigation with respect to the consent decree's new proposed rules and restrictions. The consent decree's new restrictions on snaring and trapping are unreasonable considering that no incidental bycatch of

6

lynx since the 2008 litigation would have been prevented by the new rules. Any additional restrictions on snaring and trapping are further unwarranted because the record is undisputed that, even though there has been some incidental bycatch of lynx since the 2008 litigation, none of these incidents was detrimental to the persistence of the species, which is the goal of the ESA.

## ARGUMENT

I. **The District Court Abused its Discretion in Approving the Consent Decree.**

### A. Consent decrees are reviewed for procedural and substantive fairness, reasonableness, and consistency with the governing law.

This Court "review[s] a district court's findings of fact for clear error and its legal conclusions de novo." *Smith v. AS Am., Inc.*, 829 F.3d 616, 621–22 (8th Cir. 2016) (citing *Schaub v. VonWald*, 638 F.3d 905, 923 (8th Cir. 2011) and Fed. R. Civ. P. 52(a)).

Regarding consent decrees specifically, "[t]his court reviews a district court's acceptance or rejection of a proposed settlement for abuse of discretion." *E.E.O.C. v. Prod. Fabricators, Inc.*, 666 F.3d 1170, 1172 (8th Cir. 2012) (citing *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir. 2002)). "An abuse of discretion occurs 'when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the

7

court, in weighing those factors, commits a clear error of judgment.'" *Id*. (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984)).

"When reviewing a proposed consent decree, the trial court is to review the settlement for fairness, reasonableness, and adequacy." *Id*. (quoting *United States v. Metropolitan St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992)). Specifically, "before entering a consent judgment, this Court must find that the proposed settlement is (1) procedurally fair, (2) substantively fair, (3) reasonable, and (4) consistent with the governing law." *United States v. Hilger*, No. 16-CV-0060 (WMW/TNL), 2017 WL 4773329, at *5 (D. Minn. June 7, 2017) (citing *United States v. Hercules, Inc.*, 961 F.2d 796, 800 (8th Cir. 1992)). "The district court 'is more than a recorder of contracts from whom parties can purchase injunctions.'" *Id*. (citing *E.E.O.C. v. Prod. Fabricators*, 666 F.3d at 1172). "As such, a district court should not merely 'rubber stamp' a consent judgment, but instead must 'carefully consider[ ] the underlying facts and legal arguments.'" *Id*. (citing *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir. 2002)).

The district court's role in reviewing a proposed consent decree is especially important in cases where "the interests of individuals and organizations other than those approving the settlement may be implicated" and where the consent decree "implicat[es] important public interests, such as cases involving environmental cleanup and discrimination." *Hilger*, 2017 WL 4773329, at *5 (citing

8

*e.g., E.E.O.C. v. Prod. Fabricators, Inc.*, 666 F.3d 1170 (8th Cir. 2012); *United States v. BP Amoco Oil PLC*, 277 F.3d 1012 (8th Cir. 2002); *United States v. Union Elec. Co.*, 132 F.3d 422 (8th Cir. 1997); *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371 (8th Cir. 1990)). "Common to each of these cases is that the consent decree implicated significant public or third-party interests and warranted ongoing judicial oversight." *Id.*

### B. The District Court's adoption of the consent decree was procedurally unfair.

Procedurally, the District Court erred in approving the consent decree on grounds that Appellants did not object to the standing, res judicata or merits determinations and by ignoring Judge Davis's ongoing jurisdiction of the consent decree in the previous lynx case.

In its opinion and order approving the consent decree, App. at 204-227, R. Doc. 118, Add. at 1-23, the District Court stated:

> Before addressing these objections, it is important to identify objections the Trappers do not make. The Trappers do not object to the standing, *res judicata*, or merits determinations in the order denying the DNR's dismissal motion. In other words, the Trappers do not argue that any one of these defenses provides a basis to challenge the proposed decree on the grounds that it is inconsistent with the ESA or unfaithful to the law in some other respect, meaning there is no reason to revisit the analysis underlying the decisions on these issues in that order.

App. at 214; R. Doc. 118 at 11; Add. at 11.

Appellate Case: 23-1572    Page: 17    Date Filed: 06/16/2023 Entry ID: 5287735

Here, the District Court said that the Trappers did not object to the consent decree as to standing, res judicata or merits determinations. The Trappers were granted intervention in March 2022, App. at 154-55, R. Doc. 57, and were thus not involved in the case at the time the DNR made its motion to dismiss CBD's Complaint on standing and res judicata grounds. App. at 94-118; R. Doc. 13. The Trappers generally agree with the DNR's Motion to Dismiss, particularly on res judicata/collateral estoppel grounds and the fact that Judge Davis specifically maintained ongoing jurisdiction of the consent order in the previous 2008 litigation. *See Holsten*, 2008 WL 5481122, at *2. However, the Trappers believed that issue was rejected by the District Court's August 19, 2021 order and therefore could not be raised again. App. at 119-136; R. Doc. 26; 2021 WL 3683491, at *4. By the District Court's rationale in its order approving the consent decree, the Trappers should have raised these issues in their objection to the consent decree. The District Court adopted the consent decree, at least in part, because they did not object. As a legal matter of procedural fairness, the Trappers should be given the opportunity to object on such grounds.

It was erroneous for the District Court to not consider res judicata and Judge Davis's continuing jurisdiction over the consent decree in the previous lynx case when considering whether to adopt the consent decree in this case. As stated in *E.E.O.C. v. Prod. Fabricators, Inc.*, "[c]ontinuing jurisdiction is the norm (and often

the motivation) for consent decrees." 666 F.3d 1170, 1173 (8th Cir. 2012) (citing *Local No. 93,* 478 U.S. at 524 n. 13, 106 S.Ct. 3063 ("Public law settlements are often complicated documents designed to be carried out over a period of years, ... so any purely out-of-court settlement would suffer the decisive handicap of not being subject to continuing oversight and interpretation by the court.")).

The District Court rejected the DNR's motion to dismiss in part because of the amount of time – years – that have passed since the DNR submitted its incidental take permit to the USFWS, during which the USFWS has failed to act. 2021 WL 3683491 at *5 (order on motion to dismiss); App. 207; R. Doc. 118 at 4; Add. 4 (order on consent decree). Consent decrees, however, as opposed to settlement agreements, are intended to be carried out over a matter of years, during which the court maintains jurisdiction. It was therefore incorrect for the District Court to reject the DNR's motion to dismiss and ultimately adopt the consent decree based on the amount of time that has passed between this case and the previous lynx case.

The Eighth Circuit states in *E.E.O.C. v. Prod. Fabricators, Inc.* that "[a] consent decree offers more security to the parties than a settlement agreement where the only penalty for failure to abide by the agreement is another suit." 666 F.3d at 1173 (citing *SEC v. Randolph,* 736 F.2d 525, 528 (9th Cir.1984)). Again, unlike settlement agreements, where a new lawsuit would need to be started if one party failed to comply with the terms of a settlement agreement, courts specifically

11

maintain jurisdiction over consent decrees in order to resolve any subsequent dispute relating to the terms of the consent decree. Here, Judge Davis specifically stated: "This Court shall retain jurisdiction of this case under 16 U.S.C. § 1540(g) in order to modify or terminate the order for good cause shown, or to resolve any disputes arising thereunder." 2008 WL 5481122, at *2. Because of Judge Davis's ongoing judicial oversight, the proper course of action in this case should have been for CBD to request to modify the order and consent decree in the previous case, rather than start a new litigation and propose a new consent decree. As a matter of law, it was erroneous and procedurally unfair for the District Court to ignore Judge Davis's continuing jurisdiction over the consent order in the previous case and thus res judicata in this case.

### C. The rulemaking process in the consent decree is unfair.

The substance of the consent decree in this case is additionally unfair because it requires the DNR to implement new trapping and snaring rules within 40 days, which would not allow for traditional notice and comment rulemaking under Minn. Stat. 14.14 to 14.28. The new trapping and snaring rules in the consent decree directly implicate public interests and individuals and organizations, like the Trappers. The consent decree specifically allows the new proposed regulations to be adopted through "expedited emergency rulemaking." *See* App. 230; R. Doc. 119 at 3; Add. at 27.

The District Court rejected the Trapper's objection to the fairness of the DNR's expedited emergency rulemaking because the "good cause exemption" to traditional notice-and-comment rulemaking - Minn. Stat. 14.388 - does not apply to the DNR's authority for expedited emergency rulemaking under Minn. Stat. 84.027 subd. 13(b). R. Doc. 118 at 13, Add. at 13. The Commissioner may exercise emergency expedited rulemaking under Minn. Stat. 84.027, subd. 13(b) "[i]f conditions exist that do not allow the commissioner to comply with sections 97A.0451 to 97A.0459." Minnesota Statues 97A.0451 to 97A.0459 allow the Commissioner to use emergency rulemaking when "directed by statute, federal law, or court order to adopt, amend, suspend, or repeal a rule in a manner that does not allow for compliance with sections 14.14 to 14.28." Minn. Stat. 14.14 to 14.28 set forth the requirements for traditional notice-and-comment rulemaking.

The DNR thus has two methods to issue rules other than traditional notice and comment rulemaking: 1) "Emergency Rulemaking" under Minn. Stat. 97A.0451 to 97A.0459 and 2) "Expedited Emergency Rulemaking" under 84.027 subd. 13(b). Emergency Rulemaking under Minn. Stat. 97A.0451 to 97A.0459 can be exercised if directed by statute or court order in a manner that does not allow for compliance with traditional notice and comment rulemaking. Emergency Rulemaking allows for a period of 25 days in which interested persons can submit data and views on the proposed emergency rule, and the commissioner can modify the proposed rule if

13

supported by the data and views submitted. S*ee* Minn. Stat. 97A.0452 and 97A.0454. Expedited Emergency Rulemaking under 84.027 subd. 13(b) can only be utilized "[i]f conditions exist that do not allow the commissioner to comply with sections 97A.0451 to 97A.0459." Expedited Emergency Rulemaking under 84.027 subd. 13(b) does not provide for any public comment whatsoever; the commissioner simply publishes the rule in the state register.

The DNR did not provide a basis for its need to adopt the new rules in any manner other than traditional notice and comment rulemaking, much less utilize the Expedited Emergency Rulemaking under 84.027, subd. 13(b) rather than its Emergency Rulemaking process under 97A.0451. Here, the adoption of the consent decree is particularly impactful and unfair to public interests, as the public will not have the opportunity to participate in the rulemaking process prior to the issuance and implementation of the new snaring and trapping rules. It was therefore erroneous for the District Court to disregard the Trappers' procedural fairness arguments when considering whether to adopt the consent decree in this case.

### D. The consent decree's additional trapping restrictions are unreasonable, unduly burdensome, and ineffective at preventing the already minimal bycatch of lynx.

The District Court further abused its discretion in approving the consent decree by failing to consider the overall goal of the Endangered Species Act and the

14

specific bycatch of lynx since the 2008 litigation with respect to the consent decree's new proposed rules and restrictions.

The general purpose of the Endangered Species Act is to provide a program for the conservation of endangered and threatened species, the ecosystems upon which such species depend, and to take appropriate steps in furtherance of the program. *See generally* 16 U.S.C. 1531. Section 9 of the Endangered Species Act, 16 U.S.C.A. § 1538(a)(1)(B), makes it unlawful to 'take' a member of an endangered species. Pursuant to 50 C.F.R. § 17.31(a), it is also unlawful to take a member of a threatened species. The Canada lynx is a threatened species. 65 FR 16053 (March 24, 2000); 50 C.F.R. 17.40(k); 50 C.F.R. 17.95(a).

"The proper standard for establishing a taking under the ESA, far from being a numerical probability of harm, has been unequivocally defined as a showing of 'actual harm' to the listed species." *Am. Bald Eagle v. Bhatti*, 9 F.3d 163, 165 (1st Cir. 1993). "Accordingly, courts have granted injunctive relief only where petitioners have shown that the alleged activity <u>has actually harmed the species</u> or if continued will actually, as opposed to potentially, cause harm to <u>the species.</u>" *Animal Prot. Inst., Ctr. for Biological Diversity v. Holsten*, 541 F. Supp. 2d 1073, 1080–81 (D. Minn. 2008) ("Injunctive relief is available for a violation Section 9 of ESA. … Such relief must be precisely tailored to remedy the precise violation of the DNR.")

15

(emphasis added); *see also* Endangered and Threatened Wildlife and Plants; Final Redefinition of "Harm", 46 FR 54748-01.

Injunctive relief under ESA is thus not appropriate where the alleged activity has only a numerical probability of harm. Injunctive relief, if any, must specifically remedy an actual, past violation of the ESA that is detrimental to <u>the species</u>. The District Court stated that the consent decree does not have to be tailored to address an actual past violation. App. at 217; R. Doc. 118 at 14; Add. at 14. The Trappers generally do not dispute the concept that consent decrees do not have to be so specifically written. The Trappers' main contention with consent decree's new rules is that there has not been *any* take of lynx since the 2008 litigation that the new rules in the Lynx Management Zone would potentially prevent. It is also undisputed in the record that, even though there has been some incidental catch of lynx in traps and snares, none of this bycatch was detrimental or harmful to the persistence of <u>the species</u>.

Dr. John Erb testified, and it is otherwise undisputed in the record, that the new proposed rules are not likely to prevent incidental catch of lynx:

> I don't see anything on the horizon that's necessarily going to dramatically change that [incidental catch of lynx] in terms of like, you know trapper effort, fur prices, weather. I mean, that -- I believe that would be what would occur moving forward even in the absence of new regulations.
> …
> I don't have any data or reason to believe that if we didn't make any new changes, I believe that the recent history would probably be true moving

16

forward, meaning we would continue to possibly kill one lynx every other year.

App. at 42; Tr. at 175-76.

With respect to the individual lynx that have been incidentally trapped or snared since the 2008 litigation (identified on App. 66-69, Ex. D-23), Dr. Erb testified at the hearing, and case law confirms, the Convention on International Trade in Endangered Species (CITIES) incidental take statement (ITS) allows for the take of two lynx per year as part of a state's trapping regime. App. at 21; Tr. at 89-90; *WildEarth Guardians v. United States Fish & Wildlife Serv.*, 342 F. Supp. 3d 1047, 1062 (D. Mont. 2018) (citing *Center for Biological Diversity v. Otter*, 2018 WL 539329, at *2 (D. Idaho Jan. 24, 2018)). The CITIES ITS is "the basis for state and tribal immunity for inadvertent lynx trapping" in bobcat traps. *WildEarth Guardians v. United States Fish & Wildlife Serv.*, 342 F. Supp. 3d at 1062 (citing *Ramsey v. Kantor*, 96 F.3d at 434, 441–42 (9th Cir. 1996)). Two of the lynx listed on Exhibit D-23 therefore "would be covered, legally covered, under that national CITES ITS." App. at 21; Tr. at 90.

Dr. Erb further testified that "two were taken by tribal trappers who operate under tribal regulations," and the state is "not obligated to be responsible for a tribal member who takes on the reservation following their regulations." App. at 21; Tr. at 89. Dr. Erb additionally stated that two lynx on Ex. D-23 "involved a catch by federal wildlife biologists who captured them during wolf live-capture operations." App. at

17

21; Tr. at 90. Dr. Erb testified that the cause of death for the lynx found on March 15, 2022 was "inconclusive, but suggestive of starvation, injury" from possibly a snare or being hit by a car. App. at 25; Tr. at 106.

CBD asserted in its Post-Hearing Memorandum that there were nine unpermitted lynx captures or 'takes' since 2008. Dkt. 112 at 13. CBD did not point to any evidence, nor is there any, that the consent decree's proposed new rules would have prevented harm (death or injury) to any of these individual animals, much less to the lynx species. The Trappers will address each of these as follows:

- December 1, 2009: The lynx was caught in a foothold trap and was released alive. It therefore was not harmed. There is nothing in the record that the maximum jaw opening of the trap was greater than 6.5 inches. App. at 66.

- October 28, 2011: The lynx, caught in a foothold trap, "died when USGS biologist Shannon Barber-Meyer attempted to restrain the animal with a catchpole." Again, no evidence that the maximum jaw opening of the trap was greater than 6.5 inches. App. at 66.

- November 24, 2013: The lynx was caught in a foothold trap and was "released alive and apparently unharmed." It therefore was not harmed for purposes of the ESA. There is nothing in the record that the jaw opening of the trap was greater than 6.5 inches. App. at 66.

- February 15, 2014: The lynx died in a 3/32" washer lock snare, 9" loop, loop 6-7" off ground, set for coyotes. Dr. Erb confirmed that this incident took place within the Lynx Management Zone. Erb Decl., R. Doc 114 at ¶ 4. A 3/32" inch cable would be allowed under the consent decree's proposed rules. The washer lock was described as "large" on Exhibit D-13 and thus the record would support that it is allowed under the proposed new rules. The snare length was 5 feet, which would also be allowed under the proposed new rules. There is no other information

18

regarding any possible entanglement or how the snare was anchored. App. at 66 and 71.

- November 30, 2014: The lynx was caught in a foothold trap and released alive. Nothing indicates the jaw opening of the trap was greater than 6.5 inches. App. at 66 and 72-73.

- December 27, 2014: This lynx was dead in a snare, but outside of the Lynx Management Zone. No other details about the snare are known. App. at 66 and 74.

- December 29, 2014: This lynx was also dead, from snare, but outside of the Lynx Management Zone. No other details about the snare are known. App. at 66 and 75.

- November 25, 2018: The lynx was caught in a foothold trap and released alive with "no visible injuries." Nothing indicates the jaw opening of the trap was greater than 6.5 inches. "Lynx ran off seemingly unharmed." App. at 66 and 76.

- November 11, 2020: Lynx caught in foothold trap and released alive. No information that the jaw opening of the trap was greater than 6.5 inches. App. at 66.

In summary, there is no specific evidence in the record that the consent decree's proposed rules would have actually prevented harm (injury or death) to any of the above individual animals. Dr. Erb repeatedly testified that the incidental capture of lynx traps and snares was already "incredibly low," and the rules promulgated from the 2008 litigation "halve[ed] the risk of death." App. at 17; Tr. at 73. Further, and importantly, Dr. Erb repeatedly agreed that trapping and snaring and any incidental capture of lynx in traps or snares is not a factor threatening lynx

19

and does not have any negative effect on the species' ability to persist in Minnesota. App. at 19-20, 41, and 43; Tr. at 84-85, 169-70, and 178.

The record as whole does not support that *any* of the consent decree's proposed new rules in the Lynx Management Zone will prevent the already 'incredibly low' incidental capture of individual lynx. There is also nothing in the record that the death of any lynx listed on Ex. D-23 would have been prevented by the proposed new rules. Most importantly, it is undisputed in the record that, notwithstanding there has been some incidental capture of lynx since the 2008 litigation, none of these incidents was harmful to the persistence of the species in Minnesota. Any additional rules or restrictions on trapping and snaring, such as those proposed in the consent decree, are therefore unreasonable, unduly burdensome, and not necessary to further promote the goal of protecting the lynx species in Minnesota.

Regarding the specific new proposed rules in the consent decree, the District Court discussed that the Trappers do not dispute the new rules in the proposed consent decree will reduce lynx mortality. *See* App. 226; R. Doc. 118 at 23; Add. 23. The District Court misinterpreted the Trappers' argument on this issue. The Trappers do not dispute that the new rules will reduce catch and lethality of all species, since it will be exceptionally hard to snare any animal with the new rules. The Trappers do dispute that the new rules will be effective in preventing any incidental bycatch that has occurred since 2008 lynx litigation. The Trappers

20

additionally and importantly assert that there has been no harm (injury or death) to lynx in the Lynx Management Zone that the new rules would prevent, nor has any bycatch since the first case negatively impacted the survivability of the species.

Three of the five proposed new restrictions on trapping are especially unreasonable and unduly burdensome – the loop stop and lock requirements in paragraph 6(a) and the anchoring restrictions in paragraph 6(b) of the consent decree. The Trappers will address each of these below.

      i.    <u>The loop stop requirement in paragraph 6(a)(i) is unreasonable and unsupported in the record.</u>

Paragraph 6(a)(i) of the consent decree requires "a minimum loop stop that prevents the snare loop from closing to a diameter less than 3 ¼ inches." DNR stated in its post-hearing brief that "the loop stop 'would substantially if not fully eliminate the risk of mortality caused from constriction pressure on the neck.'" App. 190; R. Doc. 113 at 11. The DNR cites Dr. Erb's testimony and Exs. D-25, D-27 and D-28 in support of their position. App. at 190-92; R. Doc. 113 at 11-13.

Dr. Erb admitted, however, that he has minimal to moderate personal experience on lethal snares and was not involved in any research on lethality of snares. App. at 32; Tr. at 133. In reference to Ex. D-27, *Injury Scores and Spatial Responses of Wolves Following Capture*, Dr. Erb admitted that the purpose of the research was to catch wolves in cable restraints and in foot traps, put a tracking collar on them and look at the how far the wolves travelled. App. at 32-33; Tr. at 136-37.

21

The study did not examine the lethality of snares, nor did it involve the species at issue in this case -- lynx. App. at 33; Tr. at 137. In reference to Exhibit D-28, *Evaluation of 2 Cable Restraints with Minimum Loop Stops to Capture Coyotes*, Dr. Erb conceded that the study was "focused on the efficiency of two different loop stops, will fewer coyotes get out of that this other one;" animal welfare was not the focus of the study. App. at 33; Tr. at 139.

Regarding Exhibit D-25, *2016 Summary of Furbearer Trapping Regulations in the United States*, Dr. Erb conceded that states with minimum loop stop requirements adopted them to allow deer or hunting dogs to get free. App. at 32 and 39; Tr. at 135-36 and 162. None of these states adopted such requirements for the purpose of potentially reducing lynx bycatch or mortality. *Id*.

Mr. Highland testified, based on his nearly 60 years of trapping, App. at 55, Tr. at 227, that he does not use loop stops because "they cause undue discomfort to an animal." App. at 48; Tr. at 199. Mr. Highland explained the animal will "twist[] and roll[] when they first get caught." *Id*. Mr. Highland further stated that, with a loop stop, as well as with the wider lock, it is more likely that the animal could chew the snare off, which would prevent the snare from ever coming off and would be cruel to the animal. App. at 49; Tr. at 201.

There is no evidence in the record that loop stops would have prevented past lynx bycatch and mortality in Minnesota. Mr. Highland testified, based on his

22

experience, that a loop stop would cause injury to the animal. The loop stop requirement is therefore unreasonable, not tailored to prevent incidental catch and injury to lynx and will cause more injuries to animals who get caught in the snares.

ii. The lock requirement in paragraph 6(a)(ii) is unreasonable and unsupported in the record.

Paragraph 6(a)(ii) of the proposed consent decree requires "a one-piece snare lock that contains no moving parts, has no integrated or attached compression springs, and has a side that contacts the animal that is a minimum of ½ inch in width." Dr. Erb testified to eight examples of locks that would be allowed. App. at 11; Tr. at 51 (referring to Ex. D-34).

In reference to Exhibit D-26, Dr. Erb conceded that cam locks are by far the number one choice for trappers and would not be allowed under the proposed new rule. App. at 34; Tr. at 142. Mr. Highland stated that he uses cam locks on all his snares. App. at 49; Tr. at 201. Mr. Highland testified that "the wider lock there's more chance of that underfur of the animal getting caught in there." *Id*. Mr. Highland said that he's "had locks get plugged up with animal fur in years past where it was acting like a stop, and you get that edema in the head, water heads." App. at 48; Tr. at 200.

The record does not support that a wide lock with no integrated or attached compression springs would have prevented any lynx death on Exhibit D-23, App. 66-67. In fact, the report for the February 15, 2014 lynx death on Exhibit D-13, App.

71 specifically describes the washer lock as "large," suggesting that it would be allowed under the consent decree's proposed new rules. Considering that the cam lock is the most popular and widely used lock by trappers, this proposed new rule places undue burden and expense on trappers and is not otherwise designed to prevent any past capture of lynx in Minnesota.

### iii. The anchoring restriction in paragraph 6(b) is unreasonable and unsupported in the record.

Paragraph 6(b) of the proposed consent decree prohibits the anchoring of any snares on land to any fence, tree or rooted vegetation greater than ½ inch diameter. Dr. Erb stated that the purpose of this proposed rule was to prevent "entanglement." App. at 13; Tr. at 57. There is no evidence that the lynx caught in snares in Minnesota, Ex. D-23, died from entanglement or being "suspended" from woody vegetation. *Id*. Dr. Erb also conceded that "it can be challenging in winter, no matter the conditions, to stake traps." App. at 13; Tr. at 58.

Mr. Highland testified that prohibiting the anchoring of snares to woody vegetation in the Lynx Management Zone and limiting cables to a length of 7 feet would eliminate any meaningful snaring in the region. App. at 50; Tr. at 206-208. Mr. Highland explained that Northeast Minnesota is "glacial rock" which is "very hard to drive in stakes." App. at 50; Tr at 206. Anchoring in ice is also extremely difficult because "[m]ost of your snaring is done on a shoreline of a beaver pond or a lake, and usually near the shoreline the ice is real poor, and if you went in and set

24

the snare in the middle of a lake, you'd catch absolutely nothing." *Id*. Mr. Highland said that the furbearers he snares – fox, coyotes, bobcats – "they're hunting the thick cover. They're not going out in the open." App. at 50; Tr. at 208. Therefore, the chance that a fox, coyote or bobcat would happen to go into a snare that is out in the open and not anchored to woody vegetation is "next to none." App. at 51; Tr. at 210. Mr. Highland said quite simply that he "will not snare" if the proposed new rules go into effect because it would be extremely inefficient and ineffective. App. at 51; Tr. at 212.

As explained by Mr. Highland, paragraph 6(b) of the consent decree would put an immense burden on trapping in the Lynx Management Zone, such that there would be no meaningful snaring of lawful species. Importantly, though, there is no evidence in the record that any of the captured lynx on Exhibit D-23, App. 66-67 were entangled and hurt or killed in woody vegetation and/or by cables longer than 7 feet. This provision of the proposed consent decree is therefore unsupported in the record and places an immense burden on lawful snaring in the Lynx Management Zone.

In summary, the District Court abused its discretion by not considering the consent decree's overall ineffectiveness in preventing any individual injury or death of lynx since the 2008 litigation in comparison with the burden the additional restrictions will place on otherwise lawful trapping and snaring in the Lynx

Management Zone. It was further erroneous for the District Court to disregard the undisputed evidence in the record that none of the incidental bycatch of lynx since the 2008 litigation impacted the persistence of the species in Minnesota.

## CONCLUSION

For the reasons discussed herein, the Trappers respectfully request the Court reverse the District Court's approval of the consent decree.

Dated: June 13, 2023         **LEISTICO & ESCH, PLLC**

*/s/ Gary R. Leistico*
Gary R. Leistico, #024448X
Jayne E. Esch, #0399215
P.O. Box 365
Clear Lake, MN 55319
Telephone: (763) 272-5825
Fax: (763) 392-0757
Email: gleistico@leisticoesch.com
Email: jesch@leisticoesch.com

***Attorneys for Appellants***

26

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it complies with Fed. R. App. P. 32(a)(7)(B) because the brief contains 6,622 words excluding the parts of the brief identified in Fed. R. App. P. 32.1(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using 14-point Times New Roman.

3.     This brief has been scanned for viruses and it is virus free.


Dated: June 13, 2023                    **LEISTICO & ESCH, PLLC**


                                         */s/ Gary R. Leistico*
                                        Gary R. Leistico, #024448X
                                        Jayne E. Esch, #0399215
                                        P.O. Box 365
                                        Clear Lake, MN 55319
                                        Telephone: (763) 272-5825
                                        Fax: (763) 392-0757
                                        Email:  gleistico@leisticoesch.com
                                        Email:  jesch@leisticoesch.com

                                        ***Attorneys for Appellants***

Appellate Case: 23-1572     Page: 35     Date Filed: 06/16/2023 Entry ID: 5287735

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on June 13, 2023, he electronically filed the Principal Brief of Appellants with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. He certifies that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: June 13, 2023          **LEISTICO & ESCH, PLLC**

         */s/ Gary R. Leistico*
         Gary R. Leistico, #024448X
         Jayne E. Esch, #0399215
         P.O. Box 365
         Clear Lake, MN 55319
         Telephone: (763) 272-5825
         Fax: (763) 392-0757
         Email: gleistico@leisticoesch.com
         Email: jesch@leisticoesch.com

         *Attorneys for Appellants*

28