CASE NO. 23-1572

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

Center for Biological Diversity
*Plaintiff – Appellee*

v.

Sarah Strommen, in her official capacity as Commissioner of the Minnesota
Department of Natural Resources
*Defendant - Appellee*

v.

Minnesota Trappers Association; National Trappers Association; Fur Takers
of America, Inc.
*Intervenor Defendants – Appellants*

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
CASE NO. 20-CV-02554 (ECT/JFD)

**ADDENDUM**

**GARY R. LEISTICO (#024448X)**
**JAYNE E. ESCH (#0399215)**
Leistico & Esch, PLLC
P.O. Box 365
Clear Lake, MN 55319
Telephone: (763) 272-5825
Fax: (763) 392-0757
Email: gleistico@leisticoesch.com
Email: jesch@leisticoesch.com
*Attorneys for Intervenor Defendants - Appellants Minnesota Trappers*
*Association; National Trappers Association; Fur Takers of America, Inc.*

# INDEX TO ADDENDUM

**ADD. #**

Doc. 118 – Opinion and Order (2/21/2023).......................................................001

Doc. 119 - Consent Decree and Order (2/21/2023)...........................................025

Doc. 120 – Judgment (2/22/2023) ....................................................................035

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Center for Biological Diversity,                           File No. 20-cv-2554 (ECT/JFD)

        Plaintiff,

v.                                                                      **OPINION AND ORDER**

Sarah Strommen, *in her official capacity*
*as Commissioner of the Minnesota*
*Department of Natural Resources*,

        Defendant,

and

Minnesota Trappers Association, National
Trappers Association, and Fur Takers of
America, Inc.,

        Intervenor Defendants.

---

Collette Lucille Adkins, Center for Biological Diversity, Circle Pines, MN, and Marc D. Fink, Center for Biological Diversity, Duluth, MN, for Plaintiff Center for Biological Diversity.

Peter J. Farrell and Oliver J. Larson, Minnesota Attorney General's Office, St. Paul, MN, for Defendant Sarah Strommen.

Gary R. Leistico and Jayne E. Esch, Leistico & Esch PLLC, Clear Lake, MN, for Intervenor Defendants Minnesota Trappers Association, National Trappers Association, and Fur Takers of America, Inc.

---

     This case is the second installment in a dispute over the impact that Minnesota's

trapping regulations have on the state's population of Canada lynx. A different court in

this District previously ordered the Minnesota Department of Natural Resources to apply

for a permit from the federal government that would allow "incidental take[s]" of the lynx and, pending a decision on that application, to adopt new trapping regulations meant to protect the lynx.  In this case, the Center for Biological Diversity claims that the agency has not obtained a permit and that its revised regulations continue to cause unlawful harm to the lynx.

The Center and the DNR seek approval of a consent decree.  Under the proposed decree, the DNR would impose additional restrictions on trapping activities in the geographic area known as the Lynx Management Zone in northeastern Minnesota.[1] Three organizations representing the interests of trappers—the Minnesota Trappers Association, the National Trappers Association, and the Fur Takers of America, Inc.— have intervened in the case as defendants and oppose entry of the decree.  The decree will be approved because it is procedurally and substantively fair, reasonable, and consistent with the governing law.

I

The Canada lynx is a "rare wild cat" known for a distinctive appearance "characterized by tufted ears, hind legs that appear longer than front legs, and a pronounced goatee under the chin."  ECF No. 1 ¶ 13.  An estimated "50 to 200 lynx" reside in northern Minnesota, which is "one of the few places left in the United States that contains lynx habitat with the quality and quantity to sustain lynx populations."  *Id.* ¶ 15. Since 2000, the Fish and Wildlife Service—one of the federal agencies responsible

---

[1]     The Lynx Management Zone is essentially all of Minnesota east of a line running along U.S. Highway 53 from Duluth to International Falls.  ECF No. 111 at 94.

2

for administering the Endangered Species Act ("ESA")—has considered the lynx to be a "threatened" species. *Id.* ¶ 14; *see* 16 U.S.C. § 1533(a); 65 Fed. Reg. 16,052 (Mar. 24, 2000). This designation gives the species certain protections under the ESA—most notably, it makes it unlawful for "any person subject to the jurisdiction of the United States" to "take" the species "within the United States." 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §§ 17.31(a), 17.40(k). The term "take" encompasses a wide range of actual or attempted conduct, including "trap[ping]." 16 U.S.C. § 1532(19); *see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 697–99 (1995).

The Center for Biological Diversity is a "nonprofit organization dedicated to the protection and restoration of biodiversity." ECF No. 1 ¶ 5. At least some of its members "live, work, recreate, and study in areas throughout the lynx's current range in Minnesota." *Id.* ¶ 8. These members "enjoy seeing lynx . . . and would like to see the lynx population fully recover in Minnesota and across the country." *Id.*

Hoping to vindicate these interests, the Center and another organization sued the DNR in 2006, claiming that the DNR, through its regulations, was "authorizing trapping that resulted in illegal incidental take of Canada lynx" in violation of the Endangered Species Act. *Id.* ¶ 22; *see* ECF No. 16-1, Ex. 1. Judge Davis eventually agreed, granting the Center's motions for summary judgment and injunctive relief. *See Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1081–82 (D. Minn. 2008). He ordered the DNR to

> promptly take all action necessary to insure no further taking
> of threatened Canada Lynx . . ., including, but not limited to:

ADD. 003

applying for an incidental take permit[2] for Canada Lynx on or before April 30, 2008 . . . and developing and preparing a proposal . . . to restrict, modify or eliminate the . . . incidental taking of Canada Lynx through trapping activities in the core Canada Lynx ranges.

*Id.* at 1081.

In response to that initial order, the DNR applied for an incidental take permit from the Fish and Wildlife Service and submitted a regulatory proposal to the court. ECF No. 1 ¶ 25; *see* ECF No. 16-3. Judge Davis then ordered the DNR to promulgate its proposed regulations, with a few modifications not relevant here, on an emergency basis so that they would take effect by October 25, 2008. ECF No. 16-6. These updated regulations were to remain in effect until one of four things happened: (1) the DNR received an incidental take permit; (2) the Fish and Wildlife Service issued a more general rule addressing incidental take of the lynx; (3) the lynx was delisted from protection under the Act; or (4) the court ordered otherwise. *Id.* at 4–5. To date, although fourteen years have passed, the Fish and Wildlife Service has not acted on the DNR's permit application "despite the DNR's repeated requests that it do so," nor has it taken any of the other regulatory actions that Judge Davis contemplated in his order. ECF No. 1 ¶ 27; ECF No. 16-9 at 4.

---

2       An incidental take permit insulates the permit holder from liability under the Endangered Species Act for takings that are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). In order to obtain one, an applicant must show that it will take steps to mitigate the impacts of such takings. *See id.* § 1539(a)(2)(A).

4

In December 2020, the Center filed this action.  In the Complaint, it acknowledges that the DNR has complied with Judge Davis's order, but it alleges that the agency's amended regulations have proven ineffective.  *See* ECF No. 1 ¶¶ 30, 37–39.  Specifically, although the DNR does not directly authorize the trapping of lynx, it "oversees licensing and regulation of trapping" for a variety of other species, and "[l]ynx are vulnerable to being caught in traps set for these other animals." *Id.* ¶¶ 31–36.  A number of lynx have been injured or killed by otherwise lawful traps, and because the DNR has not obtained an incidental take permit, the Center believes that the agency is continuing to violate the Endangered Species Act. *Id.* ¶¶ 41–55, 61–65.

The DNR responded by filing a motion to dismiss the Complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.  ECF No. 13.  The Motion to Dismiss was denied.  To summarize, I determined that the Center had pleading-stage standing to raise its claim because it adequately alleged an injury in fact, that the DNR is causing its injury, and that the relief requested by the Center would redress its injury.  *Ctr. for Biological Diversity v. Strommen*, No. 20-cv-2554 (ECT/BRT), 2021 WL 3683491, at *3–4 (D. Minn. Aug. 19, 2021). Though it was "a close call," I determined that the Center was not precluded from bringing this case by virtue of the judgment in the Center's prior lawsuit before Judge Davis and principles of *res judicata*. *Id.* at *4–5.  Finally, I determined that the Center's allegations of past lynx takings "plausibly show[ed] that it is 'likely that additional takings may occur unless further regulations are implemented,'" *id.* at *7 (quoting *Animal Prot. Inst.*, 541 F. Supp. 2d at 1081), and that this was "enough to state a plausible claim

for declaratory and injunctive relief," *id.*; *see also Ctr. for Biological Diversity v. Otter*, No. 1:14-CV-258-BLW, 2018 WL 539329, at *2 (D. Idaho Jan. 24, 2018); *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 99 (D. Me. 2008).

On September 23, 2021—a little over one month after the denial of its motion to dismiss—the DNR answered the Complaint, and the litigation moved forward. *See* ECF Nos. 35, 36. In addition to whatever discovery may have been taking place, the docket reflects that the Center and DNR engaged in extensive settlement discussions. The Center proposed a "framework for settlement" on September 3, 2021. ECF No. 32 at 5. In late January 2022, the parties reported that they were "working well together towards settlement." ECF No. 39. In light of the parties' reported progress, the fact-discovery deadline was extended "to allow the parties to concentrate on settlement." *Id.*; *see also* ECF No. 40.

On February 18, 2022, the Minnesota Trappers Association, National Trappers Association, and Fur Takers of America, Inc. ("the Trappers") moved to intervene. ECF No. 41. In support of their motion, the Trappers argued primarily that restricting trapping in the ways sought by the Center would significantly and adversely affect their rights and the rights of their members to trap in Minnesota and that the DNR, "as the regulator of trapping in Minnesota[,] do[es] not adequately represent the interests of" either the Trappers or their members. ECF No. 43 at 1–2. Neither the Center nor the DNR opposed the Motion. *See* ECF Nos. 44, 48, 53. Magistrate Judge Docherty granted the Motion to Intervene on March 9, 2022. ECF No. 57.

The Center and the DNR filed a joint motion seeking approval and entry of the proposed consent decree on June 1, 2022. ECF No. 71. Relevant here, the proposed decree requires the DNR to "maintain . . . the trapping restrictions that are currently in effect in the Lynx Management Zone as a result of the Court's Order in *Animal Protec. Inst. v. Holsten*, No. 06-CV-3776 (MJD/RLE), ECF No. 163 (July 14, 2008)," and incorporates the terms of that Order. ECF No. 72 ¶¶ 7, 8. In addition, the proposed decree adds restrictions as follows:

> By whatever regulatory means are necessary, including expedited emergency rulemaking, the DNR shall, within 40 days after this Decree becomes effective, publish a rule in the State Register that imposes the following additional restrictions on trapping activities in the geographic area known as the Lynx Management Zone, as defined in Minn. R. 6234.1000, subp. 5:
>
> a. In the Lynx Management Zone, snares, except when placed as water sets, must be equipped with: (i) a minimum loop stop that prevents the snare loop from closing to a diameter less than 3 ¼ inches; and (ii) a one-piece snare lock that contains no moving parts, has no integrated or attached compression springs, and has a side that contacts the animal that is a minimum of ½ inch in width.
>
> b. In the Lynx Management Zone, snares, except when placed as water sets, may not be attached or anchored to a fence or tree, and may not be set in a location such that they, when fully extended, can reach any part of a fence, or any rooted vegetation greater than ½ inch in diameter.
>
> c. In the Lynx Management Zone, snares, except when (i) placed as water sets or (ii) used by a licensed wolf trapper as a "wolf snare" within the meaning of Minn. R. 6234.0900, subp. 6, may not exceed 7 feet in length

from the anchor point to the end of the snare when fully extended.

d. In the Lynx Management Zone, snares, except when placed as water sets, must be equipped with at least 1 swivel.

e. In the Lynx Management Zone, a person may not set, place, or operate any foothold trap that has a maximum jaw opening, when set, of greater than 6 ½ inches measured from the inside edges of the jaw, except when (i) placed as a water set or (ii) used by licensed wolf trappers during a wolf season.

*Id.* ¶ 6. The proposed decree also requires the DNR to take several steps aimed at educating the public, such as issuing a press release and including the new restrictions on its website. *Id.* ¶¶ 9, 10.

The Trappers promptly objected to the proposed decree on several grounds and requested either that the motion be denied or, alternatively, that an evidentiary hearing be scheduled on the decree. ECF No. 76. The Trappers' request for an evidentiary hearing was granted, ECF No. 83, and in consultation with the parties, a hearing was scheduled for and occurred on November 3, 2022, ECF Nos. 84, 106.

Two witnesses testified at the hearing, Dr. John D. Erb on behalf of the DNR and Mr. Bert Highland on behalf of the Trappers. *See generally* ECF No. 111 ("Tr."). Dr. Erb has a Ph.D. in Zoology and Physiology and has been a wildlife biologist at the DNR for nearly 25 years. ECF No. 113 at 9; Tr. 9–10. He is a member of an Association of Fish and Wildlife Agencies sub-group—the furbearer resources technical work group—and he has served as chair of the group for the past six years. ECF No. 113 at 9–10. Dr. Erb has published numerous trapping-related research papers and has been trapping

8

personally for over 40 years.  Tr. 13–17; *see* D-2, D-24,[3] D-27, D-29.  Mr. Highland testified based on nearly sixty years' worth of trapping experience, Tr. 183, his lengthy membership and participation in trapping-advocacy organizations, *id.* 189, and his fifteen years' experience educating and providing instruction in the areas of trapping, snaring, and related regulations, *id.* 192–93.

All Parties were present at the hearing and participated in questioning the witnesses.  *See id.* 2.  At the hearing's conclusion, additional briefing was requested and scheduled.  *Id.* 232–37.  The briefing was completed on January 10, 2023.  *See* ECF Nos. 116, 117.

## II

## A

The general rules governing a federal district court's discretionary consideration of a proposed consent decree are settled.  A federal district court cannot merely "rubber stamp" a consent decree but must instead "carefully consider[] the underlying facts and legal arguments."  *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir. 2002).  At the same time, "[a] consent decree is not reviewed as a judgment on the merits."  *United States v. Metro. St. Louis Sewer Dist. (MSD)*, 952 F.2d 1040, 1044 (8th Cir. 1992).  "Consent decrees should: spring from—and serve to resolve—a dispute

---

[3]     The Trappers filed a motion in limine to exclude certain proposed exhibits.  ECF No. 95.  In this motion, the Trappers contend that several exhibits the Center and DNR sought to introduce are irrelevant or more prejudicial than probative.  ECF No. 98 at 3.  This motion will be denied.  The exhibits are relevant to understanding the mechanics of trapping and the proposed regulations' effect on the lethality of snares.  Particularly in view of the non-jury nature of this proceeding, these exhibits are not unduly prejudicial.

within the court's subject-matter jurisdiction; come within the general scope of the case from the pleadings; and, further the objectives of the law on which the complaint was based." *E.E.O.C. v. Prod. Fabricators, Inc.*, 666 F.3d 1170, 1173 (8th Cir. 2012) (citing *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525 (1986)).  "When reviewing a proposed consent decree, the trial court is to review the settlement for [procedural and substantive] fairness, reasonableness, and adequacy." *Metro. St. Louis Sewer Dist.*, 952 F.2d at 1044; *see also Prod. Fabricators*, 666 F.3d at 1172 (same); *BP Amoco Oil PLC*, 277 F.3d at 1018 ("Reasonableness, fairness, and fidelity to the statute are . . . the horses which district judges must ride.") (quotation omitted).  A district court abuses its discretion "'when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment.'"  *Prod. Fabricators*, 666 F.3d at 1172 (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir.1984)).

## B

The Trappers advance essentially five arguments against the proposed decree: (1) they object to the rulemaking required under the decree; (2) they argue that the new regulations proposed in the decree would not prevent further lynx mortality; (3) they object to the loop-stop requirement in paragraph 6(a)(i) of the proposed decree; (4) they object to the lock requirement in paragraph 6(a)(ii); and (5) they object to the anchoring

ADD. 010

restrictions in paragraph 6(b).   I understand these objections implicate the proposed decree's reasonableness, and perhaps its substantive fairness as well.

Before addressing these objections, it is important to identify objections the Trappers do not make.  The Trappers do not object to the standing, *res judicata*, or merits determinations in the order denying the DNR's dismissal motion.  In other words, the Trappers do not argue that any one of these defenses provides a basis to challenge the proposed decree on the grounds that it is inconsistent with the ESA or unfaithful to the law in some other respect, meaning there is no reason to revisit the analysis underlying the decisions on these issues in that order.

Nor do the Trappers challenge the decree's procedural fairness.  This makes sense. Whether a consent decree is procedurally fair is answered by examining the settlement process and determining whether the parties' negotiations were "in good faith and at arm's length."  *BP Amoco Oil*, 277 F.3d at 1020.  In their joint motion to enter the decree, the Center and DNR assert that "the proposed decree is the result of good-faith, arm's length negotiations . . . that spanned more than seven months and involved significant input by subject matter experts."  ECF No. 71 ¶ 7.  The Center and DNR further assert that they "were represented throughout the negotiations by counsel with significant experience in environmental law."  *Id.*  The extensive record in this case gives no reason to question these assertions' accuracy.  Now turn to the Trappers' objections.

1

The Trappers characterize the proposed decree as requiring "'expedited emergency rulemaking'" under Minn. Stat. § 97A.0451, subdiv. 1.  ECF No. 115 at 4.

From that jumping-off point, the Trappers argue that a different statute, Minn. Stat. § 14.388, requires there to "be 'good cause' for an agency to utilize exempt rulemaking rather than traditional notice-and-comment rulemaking." *Id.* And the Trappers argue that the "good cause" required under § 14.388 requires demonstrating "'(1) that there is a serious and immediate threat to public health, safety, or welfare; (2) that the rules address that threat; and (3) that it would be contrary to the public interest to follow the usual rulemaking procedures.'" *Id.* at 4–5 (quoting *Jewish Cmty. Action v. Comm'r of Pub. Safety*, 657 N.W.2d 604, 608 (Minn. Ct. App. 2003)). The implication seems to be that the Center and DNR have not identified evidence meeting these assertedly essential elements and that this failure warrants the proposed decree's rejection. The Trappers also assert that the rulemaking contemplated by the decree will prevent the public from participating in the rulemaking process. *Id.* at 5.

These arguments are not persuasive. The Trappers' assertion that the "good cause" requirement in Minn. Stat. § 14.388 applies to the DNR's emergency rulemaking powers under Minn. Stat. §§ 97A.0451 to 97A.0459 is not correct. Those emergency rulemaking provisions nowhere reference § 14.388 or a similar "good cause" requirement as a prerequisite for the exercise of emergency rulemaking powers. Regardless, the DNR has made clear its intention to adopt the additional trapping restrictions described in the proposed decree—not under §§ 97A.0451 to 97A.0459—but through "expedited emergency rulemaking" under Minn. Stat. § 84.027, subdiv. 13(b). *See* ECF No. 72 ¶¶ 6, 11; ECF No. 80 at 6–11. Though the DNR explains at some length the various justifications for pursuing rulemaking under the authority granted in § 84.027, subdiv.

12

13(b), the Trappers do not meaningfully respond to or contest the DNR's specific justifications. Importantly, they do not argue that the DNR's exercise of this rulemaking power would be legally improper.[4] The Trappers' assertion that the public will be prevented from participating in the rulemaking process seems beside the point and incorrect. The Trappers have had a complete opportunity in this case to raise any objections they or their members might have to the proposed decree and its additional regulations. And in the decree, the Center and the DNR "recognize that the additional trapping restrictions set forth in Paragraph 6 may be challenged." ECF No. 72 ¶ 11.

2

The Trappers argue that the proposed decree is unreasonable because "neither Plaintiff nor Defendant have identified a 'harmed' lynx since 2008 (the *Holsten* case) that the consent decree's rules would have prevented." ECF No. 115 at 6. In other words, though the Trappers do not dispute that at least nine Canada lynx have been taken—*i.e.*, captured and in some instances killed—in violation of the ESA since 2008, the Trappers contend that the decree is unreasonable because the record does not show that the

---

[4] The precise extent of the DNR's authority to implement the proposed decree's additional trapping restrictions through emergency expedited rulemaking under § 84.027, subdiv. 13(b) is not plainly manifest. This authority may be exercised "[i]f conditions exist that do not allow the commissioner to comply with sections 97A.0451 to 97A.0459." Minn. Stat. § 84.027, subdiv. 13(b). The DNR does not identify these conditions but says it possesses "discretion to determine which rulemaking process [is] appropriate, depending upon the circumstances of the particular wildlife management activity that is the subject matter of the rulemaking." ECF No. 80 at 8. No authority is cited to support this legal proposition, though the DNR identifies several factors justifying the discretionary exercise of its emergency expedited rulemaking power under § 84.027, subdiv. 13(b). To be clear, because the Trappers have not challenged the DNR's authority in this specific respect, this question need not be decided.

decree's additional restrictions would have prevented any one of these takings. *Id.* at 6–9. The contention seems to be that the proposed decree is unreasonable because it does not address all past harms alleged in the Center's Complaint.[5]

This argument overstates what the law requires of a consent decree. The proposed decree is a settlement. As noted, under controlling Eighth Circuit precedent, review of a proposed consent decree must be careful but also limited to determining whether the decree is fair, reasonable, and faithful to the controlling law. *BP Amoco Oil PLC*, 277 F.3d at 1018. A federal court need not "'determine whether [the decree] is the best possible settlement that could have been obtained.'" *Sierra Club v. Entergy Ark. LLC*, No. 4:18-cv-00854, 2021 WL 9455475, at *1 (E.D. Ark. Mar. 11, 2021) (quoting *United States v. Akzo Coatings, Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991)). This is because "consent decrees are normally compromises in which the parties give up something they might have won in litigation and waive their rights to litigation." *United States v. ITT Cont'l Baking Co.,* 420 U.S. 223, 235 (1975). Thus, a consent decree "must be construed as . . . written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *United States v. Armour & Co.,* 402 U.S. 673, 682 (1971).

---

[5]     To be clear, I do not understand the Trappers to argue that the consent decree should go further and impose additional lynx-protecting restrictions. The Trappers' position in this case is that no—or at least fewer—restrictions are appropriate. And the Trappers' witness, Mr. Highland, testified that he does not believe additional trapping restrictions could be put in place to reduce the risk to lynx. Tr. 226. Though Mr. Highland acknowledged that prohibiting trapping entirely in northeastern Minnesota would reduce that risk, *id.*, neither Mr. Highland personally nor the Trappers have advocated for that result.

14

Viewed through these rules, the compromises reflected in the proposed decree are neither ineffectual nor unreasonable.   As the Center and DNR make clear in their submissions, the proposed decree's "primary goal . . . is to reduce mortality risk to lynx caught in snares."   ECF No. 117 at 4; *see also* ECF No. 116 at 5.   The Trappers do not challenge the decree's probable effectiveness in this respect.   And this goal reflects a reasonable midpoint between the Center and DNR's litigation positions and bears a reasonable relationship to the Center's claims and the DNR's defenses.   In its Complaint, the Center sought a declaration that "the DNR's authorization of recreational and commercial trapping in Minnesota results in the taking of Canada lynx without a permit, in violation of [the ESA]."   ECF No. 1 at 16, ¶ A.   As the Center points out, it "could have sought an injunction prohibiting trapping across lynx habitat in northern Minnesota until the state finally obtains an ITP for its trapping program."   ECF No. 112 at 2.   For its part, the DNR advanced jurisdictional defenses and denied liability outright.   *See Ctr. for Biological Diversity*, 2021 WL 3683491 at *3–7 (describing DNR's defenses); ECF No. 35 ¶¶ 1, 3, 19, and at 30 ¶ 2 (preserving defenses raised in Rule 12 motion).   The proposed decree reflects a reasonable compromise of these competing litigation positions: the Center obtains additional protections against lynx mortality, if not everything it wanted; the DNR obtains a degree of clarity and finality regarding its ESA compliance vis-à-vis the Canada lynx and retains the authority to allow trapping in northeastern Minnesota, though not outright rejection of the Center's case.   Under the controlling rules, these compromises do not make the proposed decree unreasonable.

3

The Trappers object to the requirement in paragraph 6(a)(i) of the proposed decree that "snares, except when placed as water sets, must be equipped with . . . a minimum loop stop that prevents the snare loop from closing to a diameter less than 3 ¼ inches." ECF No. 72 ¶ 6(a)(i).  A loop stop is "a mechanical component on a snare that prevents the loop from being able to close down past a certain diameter."  Tr. 41.  This loop-stop restriction is intended to "eliminate the risk of mortality caused from constriction pressure on the arteries in the neck."  *Id.*

The Trappers argue essentially that the record lacks evidence showing that loop stops would prevent lynx mortality and that Mr. Highland's testimony shows that the requirement is more likely to result in injuries to Canada lynx.  The Trappers suggest that two exhibits the DNR introduced to show that loop stops prevent snare lethality, Exs. D-27 and D-28, are not helpful because they involved studies of different species— wolves and coyotes—undertaken for purposes other than determining snare lethality, ECF No. 115 at 9–10.  The Trappers argue that a third exhibit showing that other states impose a loop-stop requirement, Ex. D-25, carries little weight because Dr. Erb, the Trappers say, admitted that no state identified in the exhibit adopted a loop-stop requirement to reduce lynx mortality.  ECF No. 115 at 10.  The Trappers contend that, with these exhibits discounted, Mr. Highland's testimony to the effect that loop stops cause injuries should be given dispositive weight.  *Id.*

The record supports the loop-stop requirement's reasonableness.  Dr. Erb testified that the requirement "would substantially if not fully eliminate the risk of mortality

ADD. 016

caused from constriction pressure on the arteries in the neck" of Canada lynx. Tr. 41. To support this opinion, Dr. Erb cited evidence showing that roughly one-third of states include a minimum-loop-stop requirement in their trapping regulations. *Id.* 43; *see also* Ex. D-25. He testified that loop stops are typically included in best management practices for snares for a variety of reasons in addition to reducing the risk of mortality, and he described testing that supported the inclusion of loop stops in best management practices for snares. Tr. 43–45. He testified that the use of loop stops in snares is not unethical based on studies showing that loop stops did not cause major injuries and based on his experience live-restraining wolves without ever observing "any notable injury, any serious injury, [or] anything of concern." *Id.* 45–46; *see also id.* 131 (testifying that loop stops might cause injury in "a rare situation"); ECF No. 96 ¶ 33.[6] It is true that much of the evidence Dr. Erb cited to support his opinions concerned regulations, studies, or experiences with animals other than Canada lynx. However, Dr. Erb testified that "the array of injuries that can occur in a trap would be true for any species." Tr. 75. Though the Trappers fairly identify the lack of record evidence specific to the use or effectiveness

---

[6]     The Center submitted the Declaration of Dr. Winston Vickers, ECF No. 96, in place of calling its own witness for live testimony at the evidentiary hearing. ECF No. 94. Dr. Vickers is a wildlife research veterinarian with the University California, Davis Wildlife Health Center and the Institute for Wildlife Studies in California. ECF No. 96 ¶ 1. He "ha[s] been an active veterinarian with experience with zoo, large and small domestic, exotic, and wild species for 44 years." *Id.* The Trappers moved to exclude Dr. Vickers's declaration. ECF No. 95. This motion will be denied because consideration of Dr. Vickers's opinions is neither unfair nor prejudicial. Dr. Vickers's declaration corroborates certain aspects of the testimony of Dr. Erb, who was available for cross-examination at the hearing. In other words, had the Trappers' cross-examination undermined or called into question Dr. Erb's testimony, I would have considered it to have that same effect on Dr. Vickers's declaration testimony.

ADD. 017

of loop stops with respect to Canada lynx, they cite no evidence and advance no persuasive argument to show why the evidence Dr. Erb cited regarding other species does not support his lynx-specific opinions.

Mr. Highland's testimony regarding the loop-stop requirement was credible and informed, but I do not find that his testimony either undermines Dr. Erb's testimony or establishes the unreasonableness of the loop-stop requirement.  As noted earlier, Mr. Highland testified based on nearly sixty years' worth of trapping experience, *id.* 183, his lengthy membership and participation in trapping-advocacy organizations, *id.* 189, and his fifteen years' experience educating and providing instruction in the areas of trapping, snaring, and related regulations, *id.* 192–93.  Given his extensive experience and service in these areas, it would be a mistake to dismiss Mr. Highland's testimony—as the DNR argues I should—simply because he "is not a wildlife research veterinarian" or a "wildlife research biologist."  ECF No. 113 at 12.  Regardless, Mr. Highland's opinion that a loop stop could cause undue discomfort to an animal, including edema, was not supported by evidence showing the frequency with which this occurs, and he was not asked to address or respond to the studies and other information introduced with Dr. Erb's testimony.  *See* Tr. 199–200.  Without more, it would be unwise to conclude that Mr. Highland's testimony materially undermines Dr. Erb's opinion that that the proposed decree's loop-stop requirement "would substantially if not fully eliminate the risk of mortality caused from constriction pressure on the arteries in the neck" of Canada lynx. Tr. 41.

ADD. 018

4

The Trappers next object to the requirement in paragraph 6(a)(ii) of the proposed decree that "snares, except when placed as water sets, must be equipped with . . . a one-piece snare lock that contains no moving parts, has no integrated or attached compression springs, and has a side that contacts the animal that is a minimum of ½ inch in width." ECF No. 72 ¶ 6(a)(ii). A "snare lock" is "an attachment to the cable" that prevents the loop "from opening back up after the animal has pulled it tight." Tr. 48. As Dr. Erb testified, the proposed rule would outlaw use of "a cam lock . . . specifically created to be more of a killing-style lock" that is less likely to loosen after an animal is snared. *Id.* 49. The proposed rule's half-inch minimum-width requirement would spread the snare's constrictive force at the lock point "across a larger surface." *Id.* at 50–51.

The Trappers argue that this requirement is unreasonable because it would prohibit trappers from using "cam locks [which] are by far the number one choice for trappers," would burden trappers with "undue burden and expense," would cause needless injuries to snared animals, and "is not specifically tailored to remedy any of the past take of lynx in Minnesota." ECF No. 115 at 10–11.

The record does not support these objections. At the hearing, the DNR introduced a survey—entitled "Trap Use, Furbearers Trapped, and Trapper Characteristics in the United States in 2015." Ex. D-26. The survey, conducted on behalf of the Association of Fish and Wildlife Agencies with the "input, support, and guidance" of the National Trappers Association and the Fur Takers of America, *id.* (under "Acknowledgments"), "collect[ed] updated information and trend data regarding the use of traps nationally,

regionally, and by state," *id.* at i.  The data gathered during the survey showed that 17% of trappers in the "Midwest" region (which included Minnesota) used a cam lock.  *Id.* at 101.  The data strongly suggested, in other words, that cam locks are not "by far the number one choice for trappers" in Minnesota, as the Trappers suggest, ECF No. 115 at 10, and showed that several of the more popular snare locks will remain lawful under the proposed decree, Tr. 51–53; *see also* ECF No. 96 ¶ 36.  The Trappers do not address this data.

Nor does the record support the Trappers' undue burden/expense objection.  Dr. Erb and Mr. Highland essentially agreed that the cost of a single snare lock is no more than fifty cents.  Dr. Erb testified that "they can range from 15 to 40 cents apiece . . . [and] average $4 a dozen or something like that."  Tr. 75.  Mr. Highland agreed that "a snare lock roughly costs between 50 and 40 cents a lock."  *Id.* 217–18.  The record contains no evidence tending to show that these costs are unduly burdensome either considered alone or in comparison to the lock style the proposed decree would prohibit.

The Trappers support their contention that the cam-lock prohibition would cause needless injuries to animals by relying on Mr. Highland's testimony that "with the wider lock there's more chance of that underfur of the animal getting caught in there, so in fact it would act as a restraining device and not put the animal down."  *Id.* 201; *see* ECF No. 115 at 10–11.  For two reasons, this testimony does not support the Trappers' objection.  First, the testimony seems to support the idea that a wider lock decreases a snare's lethality, and that is the point of the proposed decree's cam-lock prohibition.  Second, on

cross-examination, Mr. Highland seemed to clarify that his concern with this aspect of the decree is not that it would cause injury, but that a larger lock makes a snare "harder to hide from the animal, the target animal." Tr. 218. That is not an objection the Trappers appear to make. If they did, Dr. Erb's testimony that trappers are capable of camouflaging snares, and that the DNR has successfully snared wolves with "about the largest lock that there is" without difficulty, would rebut it. *Id.* 54; *see also* ECF No. 96 ¶ 37.

The Trappers objection that the cam-lock restriction "is not specifically tailored to remedy any of the past take of lynx in Minnesota," ECF No. 115 at 11, repeats the legal problem discussed in Part II.B.2, above. To be reasonable, a consent decree need not be "specifically tailored" or include measures that would remedy every complained-of violation. As explained, both the decree as a whole and this particular restriction reflect a reasonable, midpoint compromise of the Center and DNR's litigation positions.

5

The Trappers' final objection is to the requirement in paragraph 6(b) of the proposed decree that "snares, except when placed as water sets, may not be attached or anchored to a fence or tree, and may not be set in a location such that they, when fully extended, can reach any part of a fence, or any rooted vegetation greater than ½ inch in diameter." ECF No. 72 ¶ 6(b). These restrictions too are intended "to reduce the mortality risk if a lynx is caught in a cable." Tr. 56. As Dr. Erb explained, the restriction reduces the risk of "entanglement":

21

> So whether it is a fence, fence post, larger-diameter brush, this is often referred to in trapping as entanglement, something that the animal once caught could get entangled around, and the basic principle is, well, there's multiple ways it could occur.
>
> But one example is an animal could wind itself around a tree tight, be next to that object, be able to garner more leverage to push further and tighten the snare more.
>
> Another is, say an animal – there's a, say, one-inch diameter sapling, two-inch diameter sapling and the animal wraps around it and pulls.  That sapling can bend over.  The cable can slide up, get over a branch and it can create some lifting pressure that could in many situations result in the animal having one foot or two feet suspended off the ground, where even with the stop now the animal's weight is pushing down onto the arteries.   And so this entanglement for various reasons is known.   It's well-known amongst the trapping community that entanglement is a way to increase lethality of snares, and so that's designed to minimize the use of rooted plants or fence posts – not using, but having that present in the area where the snare can reach it.

*Id.* 57; ECF No. 96 ¶ 41 ("[Paragraph b] serves to prevent a captured animal from choking itself by repeatedly wrapping the cable around the post or tree or by hanging itself by leaping over a fence or branch.").

Based on Mr. Highland's testimony, the Trappers assert that "prohibiting the anchoring of snares to woody vegetation in the Lynx Management Zone and limiting cables to a length of 7 feet would eliminate any meaningful snaring in the region."  ECF No. 115 at 11.  The Trappers say this is because a trapper's primary alternate option (to anchoring a snare to vegetation or a fence post) is to anchor the snare to a stake, but the glacial rock throughout the Lynx Management Zone and the frozen ground trappers encounter during and around the winter months make the task of driving a stake into the

22

ground impractical.  *Id.* at 11–12.  The Trappers also assert that this restriction would require snares to be placed in open locations where target animals like fox, coyote, or bobcat do not go.  *Id.* at 12.

The Trappers do not dispute that this restriction would, as Dr. Erb testified, reduce the mortality risk of snared lynx.  Mr. Highland agreed that entanglement increases lethality and that this proposed change would reduce lethality associated with entanglement.  Tr. 221–22.  The issue therefore boils down to whether the burdens described by Mr. Highland are sufficiently substantial to warrant finding that the proposed decree is not reasonable.  They are not.  Dr. Erb acknowledged the challenge associated with driving stakes into frozen ground in winter.  *Id.* 58.  But he also testified that he and others he works with through the DNR have done that "on a regular basis" citing as one example in connection with "wolf live-trapping research."  *Id.* 59; *see also* ECF No. 96 ¶ 40.  Dr. Erb acknowledged that trappers prefer to set snares amid rooted vegetation because it "funnels the [target] animal through points."  Tr. 59.  But he also described how trappers can separate vegetation from its roots and leave it in place to achieve the same effect and that "the use of grass, smaller things nonrooted, is a common tool [used] anyway by trappers when setting snares and that can be used here."  *Id.* at 60.  On this record, I conclude that the burdens the Trappers identify are reasonably capable of being addressed and not so great as to require rejection of the proposed decree.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS**

**ORDERED THAT**:

1.      Plaintiff's and Defendant's Joint Motion for Entry of Consent Decree [ECF

No. 71] is **GRANTED**.

2.      Plaintiff's Motion to Consider Declaration [ECF No. 94] is **GRANTED**.

3.      Intervenor Defendants' Motion in Limine [ECF No. 95] is **DENIED**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February 21, 2023                    s/ Eric C. Tostrud

Eric C. Tostrud
United States District Court

ADD. 024

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

CENTER FOR BIOLOGICAL
DIVERSITY,

        Plaintiff,

  v.

SARAH STROMMEN, in her official
capacity as Commissioner of the Minnesota
Department of Natural Resources,

        Defendant,

and

MINNESOTA TRAPPERS
ASSOCIATION, NATIONAL TRAPPERS
ASSOCIATION, AND FUR TAKERS OF
AMERICA, INC.

        Defendant-Intervenors.

CASE NO. 20-2554-ECT-JFD

## <u>CONSENT DECREE AND ORDER</u>

Upon consideration of the Motion for Entry of Consent Decree and Order, it is

hereby ORDERED, ADJUDGED AND DECREED as follows:

**I.    BACKGROUND**

1.    Plaintiff Center for Biological Diversity ("the Center") brought this suit

against Defendant Sarah Strommen, in her official capacity as the Commissioner of the

Minnesota Department of Natural Resources ("the DNR"), under the federal Endangered

Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.  The Center and the DNR are referred to collectively as "the Parties."[1]

2.     The Parties recognize and the Court, by entering this Consent Decree and Order (the "Decree"), finds that this Decree has been negotiated in good faith; settlement will avoid continued litigation between the parties; settlement of this matter is in the public interest and in accordance with the ESA; and entry of this Decree is fair and reasonable.

## II.   JURISDICTION

3.     This Court has jurisdiction over the Parties and subject matter of this Decree pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g).

## III.   APPLICABILITY

4.     The provisions of this Decree shall apply to and be binding upon the Parties; any successor to Commissioner Strommen as Commissioner of the DNR; all DNR personnel who are subordinate to Commissioner Strommen or any successor Commissioner of the DNR; and the Center's directors, successors, employees, and attorneys.

## IV.   NO ADMISSION OF WRONGDOING OR LIABILITY

5.     This Decree constitutes a settlement by the Parties of disputed claims as alleged in the Complaint filed in this case.  The DNR, by entering into this Decree, makes no admission of wrongdoing, and expressly denies any liability.

---

[1] On March 9, 2022, the Court allowed the Minnesota Trappers Association, National Trappers Association, and Fur Takers of America, Inc. to intervene as defendants ("the Defendant-Intervenors").  The Defendant-Intervenors are not party to this Decree.

2

ADD. 026

## V.   COMPLIANCE

6.     By whatever regulatory means are necessary, including expedited emergency rulemaking, the DNR shall, within 40 days after this Decree becomes effective, publish a rule in the State Register that imposes the following additional restrictions on trapping activities in the geographic area known as the Lynx Management Zone, as defined in Minn. R. 6234.1000, subp. 5:

    a.   In the Lynx Management Zone, snares, except when placed as water sets, must be equipped with: (i) a minimum loop stop that prevents the snare loop from closing to a diameter less than 3 ¼ inches; and (ii) a one-piece snare lock that contains no moving parts, has no integrated or attached compression springs, and has a side that contacts the animal that is a minimum of ½ inch in width.

    b.   In the Lynx Management Zone, snares, except when placed as water sets, may not be attached or anchored to a fence or tree, and may not be set in a location such that they, when fully extended, can reach any part of a fence, or any rooted vegetation greater than ½ inch in diameter.

    c.   In the Lynx Management Zone, snares, except when (i) placed as water sets or (ii) used by a licensed wolf trapper as a "wolf snare" within the meaning of Minn. R. 6234.0900, subp. 6, may not exceed 7 feet in length from the anchor point to the end of the snare when fully extended.

    d.   In the Lynx Management Zone, snares, except when placed as water sets, must be equipped with at least 1 swivel.

    e.   In the Lynx Management Zone, a person may not set, place, or operate any foothold trap that has a maximum jaw opening, when set, of greater than 6 ½ inches measured from the inside edges of the jaw, except when (i) placed as a water set or (ii) used by licensed wolf trappers during a wolf season.

7.     The DNR shall maintain, by whatever regulatory means are necessary, including expedited emergency rulemaking, the trapping restrictions that are currently in effect in the Lynx Management Zone as a result of the Court's Order in *Animal Protec.*

ADD. 027

*Inst. v. Holsten*, No. 06-CV-3776 (MJD/RLE), ECF No. 163 (July 14, 2008) ("the 2008 Order").

8.      The terms of the 2008 Order are incorporated into this Decree by reference and the DNR shall continue to abide by the terms of the 2008 Order.

9.      The DNR shall take the following steps to educate the public about the additional trapping restrictions identified in Paragraph 6(a)-(e):

    a.   Upon publication of the rule in the State Register, make information about the additional trapping restrictions available on the "Trapping & furbearers" webpage, which is located at https://www.dnr.state.mn.us/recreation/hunting/trapping/index.html.

    b.   Upon publication of the rule in the State Register, issue a press release and send a notice through Gov. Delivery about the additional trapping restrictions.

    c.   If this Decree becomes effective on or before June 15, 2022, incorporate information about the additional trapping restrictions into the online and printed versions of its 2022-23 *Minnesota Hunting & Trapping Regulations* booklet.  If this Consent Decree and Order becomes effective on or after June 16, 2022, incorporate information about the additional trapping restrictions into the online and printed versions of its 2023-24 *Minnesota Hunting & Trapping Regulations* booklet.

10.     Upon publication of the rule in the State Register, the DNR shall include on the "Trapping & furbearers" webpage a link to pages 17-19 of the lynx avoidance brochure, which is located at https://files.dnr.state.mn.us/recreation/hunting/trapping/avoidlynx.pdf. The link shall be entitled: "**New**: Releasing lynx and other nontargets from traps."  Within one year of the effective date of this Decree (as defined below in Paragraph 24), the DNR shall prepare and make available on the "Trapping & furbearers" webpage an educational document on the proper way for trappers to subdue, handle, and release an inadvertently

4

trapped lynx. At this time, the DNR may remove the above-referenced link to pages 17-19 of the lynx avoidance brochure. The educational document shall recommend that trappers carry a catchpole and cable cutters to help release lynx and other nontarget species.

## VI.   NO OBLIGATION TO TAKE ANY ACTION IN CONTRAVENTION OF LAW

11.   No provision of this Decree shall be interpreted or constitute a commitment or requirement that the DNR take action in contravention of any other law or regulation, state or federal, substantive or procedural, including the state laws that govern rulemaking, Minn. R. ch. 14, and expedited emergency rulemaking under Minnesota law, Minn. Stat. § 84.027, subd. 13.   In addition, the Parties recognize that the additional trapping restrictions set forth in Paragraph 6 may be challenged.

## VII.   MODIFICATIONS

12.   This Decree may be modified or terminated by the Court upon good cause shown by written stipulation between the Center and the DNR filed with and approved by the Court, or upon written motion filed by the Center or the DNR and granted by the Court. The DNR and the Center each retain the right to seek to modify the Decree for good cause shown.

## VIII.  SCOPE AND EXPIRATION OF DECREE

13.   If the DNR obtains an Incidental Take Permit ("ITP") for its trapping regulations, the DNR shall not be bound by the terms of this Decree during any period when the ITP is in effect.   Instead, during any period when such an ITP is in effect, the DNR shall be bound by the terms of the ITP.   An ITP is not in effect if it is vacated, stayed,

ADD. 029

or enjoined by a court of competent jurisdiction, or withdrawn by the United States Fish and Wildlife Service ("USFWS").

14.     If, pursuant to 16 U.S.C. § 1533(d), USFWS promulgates a rule ("4(d) Rule") addressing the incidental take of Canada lynx resulting from trapping activities, the DNR shall not be bound by the terms of this Decree during any period when such a 4(d) Rule is in effect in Minnesota.  A 4(d) Rule is not in effect if it is vacated, stayed, or enjoined by a court of competent jurisdiction, or withdrawn by USFWS.

15.     If the USFWS promulgates a rule removing the Canada lynx in Minnesota from protection under the ESA ("Delisting Rule"), the DNR shall not be bound by the terms of this Decree during any period when such a Delisting Rule is in effect.  A Delisting Rule is not in effect if it is vacated, stayed, or enjoined by a court of competent jurisdiction, or withdrawn by USFWS. The requirements of this Consent Decree and Order shall only apply to that area identified in the USFWS critical habitat determination set forth in *Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx and Revised Distinct Population Segment Boundary*, 79 FR 54781, 54823-25, 54841, 54843 (2014), or any amended USFWS critical habitat determination. Nothing in this Consent Decree and Order precludes the DNR from amending Minn. R. 6234.1000, subp. 5 to reflect any such amendment of the USFWS critical habitat designation.

16.     The DNR may seek from the Court an order terminating this Decree if any of the following actions are taken by USFWS: (a) issuance of an ITP to the DNR for its trapping regulations; (b) promulgation of a 4(d) Rule addressing the incidental take of

ADD. 030

Canada lynx resulting from trapping activities; or (c) removal of Canada lynx from protection under the ESA.  The DNR may also seek from the Court an order terminating this Decree for other good cause shown.

## IX.   DISMISSAL OF CLAIMS AND ENFORCEMENT

17.   Upon the Court's entry of this Decree, all claims alleged by the Center in the Complaint against the DNR shall be dismissed with prejudice.

18.   Notwithstanding the dismissal of this action, the Court shall retain jurisdiction under 16 U.S.C. § 1540(g) until the termination of this Decree to enforce the terms and conditions of the Decree, to modify or terminate the Decree for good cause shown, and to resolve any disputes arising under this Decree.

## X.   COVENANT NOT TO SUE

19.   The Center covenants not to institute or participate in any suit or action against the DNR related to incidental take of Canada lynx from trapping for a period of seven years from the entry of this Decree. The Center expressly retains the right to bring litigation against USFWS challenging an ITP for Canada lynx issued to the DNR by USFWS.

## XI.   ATTORNEYS' FEES AND COSTS

20.   The DNR agrees to pay the Center $69,995.00 in full and complete satisfaction of any and all claims, demands, rights, and causes of action pursuant to the ESA Section 11(g)(4), 16 U.S.C. § 1540(g)(4), and other statute or common law theory, for any and all attorneys' fees and costs incurred in this litigation.

7

ADD. 031

21.     The DNR's payment as identified in Paragraph 20 above shall be accomplished by electronic funds transfer to the Center.  The Center's counsel will provide the appropriate account number, tax identification, and other information needed to facilitate payment to counsel for the DNR.  The DNR will make the payment within 60 days after the effective date of this Decree or the Center's counsel provides the necessary information to facilitate payment, whichever is later.  The Center's counsel shall notify counsel for the DNR when payment is received.

22.     The Center agrees that receipt of the full amount specified in Paragraph 20 above shall operate as a release of any and all claims for attorneys' fees and costs that the Center has incurred in this litigation.

23.     The Center agrees to hold harmless the DNR in any further litigation, suit, or claim arising from the payment of the agreed-upon $69,995.00 settlement amount pursuant to Paragraph 20.

**XII.   GENERAL PROVISIONS**

24.     The effective date of this Decree shall be the date it is entered by the Court.

25.     All correspondence concerning this Decree shall be delivered to the following contact persons.

As to Plaintiff:

Collette L. Adkins
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

ADD. 032

Marc D. Fink
Center for Biological Diversity
209 East 7th Street
Duluth, MN 55805
(218) 464-0539
mfink@biologicaldiversity.org

As to Defendant:

KEITH ELLISON
Attorney General
State of Minnesota

Peter J. Farrell
Assistant Attorney General
445 Minnesota Street, Suite 1400
Saint Paul, MN 55102
(651) 757-1424
peter.farrell@ag.state.mn.us

26.     The Decree can be executed in counterparts.

27.     The terms of this Consent Decree constitute the entire agreement of the Center and the DNR, and no statement, agreement or understanding, oral or written, which is not contained in this Decree shall be recognized or enforced.

28.     No provision of this Decree shall be interpreted as an endorsement by the Center of the State of Minnesota's trapping regulations.

### *SIGNATURES ON THE FOLLOWING PAGE*

9

**IT IS SO DECREED AND ORDERED. JUDGMENT SHALL BE ENTERED IN ACCORDANCE WITH THE FOREGOING CONSENT DECREE.**

February 21, 2023                              s/ Eric C. Tostrud
Date                                           Judge of District Court

**THE UNDERSIGNED PARTIES ENTER INTO AND APPROVE THIS CONSENT DECREE, AND BY THEIR SIGNATURES, THE UNDERSIGNED REPRESENT THAT THEY HAVE AUTHORITY TO BIND THE PARTIES THEY REPRESENT:**

| Center for Biological Diversity | DNR |
|---|---|
| /s/ Collette L. Adkins | /s/ David Olfelt |
| Collette Adkins, Senior Attorney | David Olfelt, Fish and Wildlife Director |
| Dated: 5/24/2022 | Dated: 5/24/2022 |

10

# UNITED STATES DISTRICT COURT
## District of Minnesota

Center for Biological Diversity

                  Plaintiff,

v.

Sarah Strommen

                  Defendant,

Minnesota Trappers Association, National Trappers Association, Fur Takers of America, Inc.

                  Intervenor Defendants.

**JUDGMENT IN A CIVIL CASE**

Case Number: 20-cv-02554-ECT-JFD

☐ **Jury Verdict**.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1.  Plaintiff's and Defendant's Joint Motion for Entry of Consent Decree [ECF No. 71] is **GRANTED**.

2.  Plaintiff's Motion to Consider Declaration [ECF No. 94] is **GRANTED**.

3.  Intervenor Defendants' Motion in Limine [ECF No. 95] is **DENIED**.

Date: 2/22/2023

KATE M. FOGARTY, CLERK